## Case No. 14,900.

### UNITED STATES v. CUMMINGS.

[3 Pittsb. Leg. J. 29.]

District Court, W. D. Pennsylvania. May 8, 1855.

MAIL ROBBERY — INDICTMENT—EVIDENCE—TRIAL.

[This was an indictment against Henry Cummings, charging him with robbing the mail.] The indictment being read to the prisoner, he plead "not guilty." This case was set down for the previous term, but a continuance was granted, the defendant alleging that he was not prepared to go to trial, owing to the absence of important witnesses.

The jury is composed of the gentlemen named below: (1) George Conner, (2) Alex. Mestergedd, (3) Wm. M. Barrow, (4) John Scott, (5) Levi Colvin, (6) J. A. Patterson, (7) Thos. Brownfield, (8) Hugh McKee. (9) John Long, (10) Wm. H. Blair, (11) A. S. Davis, (12) John Rogers.

Charles Shaler, for the Government.
Samuel W. Black, J. Bowman Sweitzer, and John H. Hampton, for the prisoner.

Cummings is a robust, healthy-looking man, and has a fine appearance. He is apparently about thirty-five years of age.

The charge on which he is arraigned is as follows, as stated by Judge Shaler in opening the case: About the middle of June, 1854, a gentleman named Oliver Judd, residing in the town of Monterey, Massachusetts, put a letter containing two $50 notes on the Mahaiwe Bank, same state, into the post office at that place, addressed to Nathaniel Hubbard, a rela-

tive, at Harrison, Potter county, Pennsylvania. Expecting the letter. Hubbard called at the post office at Harrison, and inquired of Cummings, who was postmaster, whether the package had arrived. The answer was that it had not. He repeated the call several times, as well as did other members of the family, and each time the answer was the same. Hubbard then wrote to Judd, that the letter had not reached its destination, and desired to know something concerning it. The clerk in the post office at Monterey, before enclosing the notes in an envelope, had taken a memorandum of them, and this was forwarded to Hubbard. He again called upon Cummings, but without gaining any information. He asked to look at the record, and Cummings answered that he had sent it to Washington City. It was afterwards found, however, in the post office at Harrison, but no entries for June were on it. Hubbard's suspicions as to the honesty of Cummings became aroused, from certain circumstances that came to his knowledge. During the month of October, Cummings had made arrangements to visit the West, in company with several of his acquaintances. Before the party started on their journey, Hubbard acquainted one of them with the facts that he was in possession of, and desired him to watch Cummings closely, to see whether he passed or had money of the description. When the travelers reached Detroit, Michigan, Cummings said that, as he had large bills, and wished to get them changed, he would pay the fare of the whole party, and then they could refund to him. The proposition was agreed to, and in the meantime the man who had the memorandum made his companions acquainted with the matter. They remained in Detroit several hours, and during the day Cummings remarked that he had a note for which he wished to get smaller ones, and that he would repair to a broker's, and get it exchanged. He walked up one street till he reached another, where he turned. His associates stepped into a clothing store, purchased some articles, and then followed after him. Just as they turned the corner, they saw him coming out of an exchange office, and when he came up to them, they told him to go to the hotel and wait for them, as they also wished to get bills exchanged. On entering the broker's they inquired whether Cummings had procured small notes for a large one, and receiving an affirmative reply, they requested to look at the large bill, and found that it answered the description precisely. They immediately had him arrested, and on going to the railroad office they discovered that the note with which he paid their fare, was exactly similar to the other one missed from the letter. Cummings was brought to this city and lodged in jail, where he has been ever since.

William Bostwick testified—Reside in Great Barrington, Massachusetts; am cashier of the Mahaiwe Bank, at that place; (one of the

notes was shown to witness, and he pronounced it a genuine issue of his bank; it was No. 306, letter A, and dated August. 1853,) no duplicate numbers of that letter are issued; all $50 notes are lettered A; have no regular time of calling in and cancelling such notes; the number is the only way in which the note can be distinguished from other notes of the same denomination.

B. C. Langdon testified—Reside in Monterey, Massachusetts; am clerk in the post office at that place; Mr. Oliver Judd, on the 16th of last June, came into the office with two $50 notes, and requested me to inclose and direct them to Nathaniel Hubbard, at Harrison Valley, Potter county, Pa.; did as he wished; took a memorandum of the description and denomination of the bills; they were numbered 302 and 306; put the letter in the usual place for letters in the post office; some time after, received a letter from Mr. Hubbard, in which he stated that the letter had not reached its destination; replied to him, saying I had mailed it; also wrote to Cummings, to ask him whether he had received any letters from our office of the date of the 16th June. Cross-examined—Have a distinct recollection of directing the letter to Nathaniel Hubbard, at the request of Mr. Judd; did not take a memorandum of the denomination of the notes, as I did not consider it necessary.

The prosecution offered in evidence a leaf from the register of the post office at Monterey, on which the letter was entered. Mr. Hampton objected, contending that it was necessary to produce the register itself. Col. Black thought the objection was sound, and read an extract from the English law in support of the position. THE COURT sustained the objection.

Nathaniel Hubbard testified—Reside in Harrison, Potter county, Pa.; Henry Cummings was postmaster there in June; received a letter at his office, informing me that a letter had been sent to me; inquired of Cummings whether a letter from Monterey had been received by him; he said not; it is often the case that neighbors take letters out for me, and I asked Cummings to look at the record; he said he had sent the records away; I afterwards saw the record, examined it—during the month of July—and found no entries for June; think I informed several persons of the description of the notes, and requested them to look out for the money; informed one or two persons who were accompanying Cummings to the West; gave one of them a memorandum; John A. Tryal was the man; wanted him to see whether Cummings passed money of the description of Nos. 302 and 306 on the Mahaiwe Bank, of $50; Cummings left Harrison in October, in company with four or five gentlemen. Cross-examined—The second letter was got out of the office by a neighbor, who handed it to me; it was in July, I think, that I expected the letter containing the money; Cummings left for the

West in October; Mr. Tryal was the person to whom I made known my suspicions.

Luther W. Hubbard testified—Reside in Harrison, Potter county; Henry Cummings was postmaster there in the summer of 1854; inquired for a letter which I understood had been sent to my father; made inquiries frequently, but without gaining any information.

The examination of the witness having been concluded, the court adjourned until three o'clock in the afternoon.

### Afternoon Session.

John S. Tryon, sworn—My place of residence last summer was Harrison Valley; knew Cummings there; he and myself and others went West last September; he said he had two $100 bills which he got a year before, and had kept for the purpose of traveling with. After we started he said he had fifty-dollar bills. At Hornellsville we paid the fare on the cars for the party to Chicago. When we were in Detroit, Cummings spoke about getting his money changed, and we all went with him; he passed one or two offices that were not opened; I then stopped in a clothing store, with the others; Cummings went on and got his money changed; afterwards I met him, and he told me where he got his money changed; Fletcher and myself went there; inquired of the broker what bill prisoner had (objected to); prisoner was not present; the broker showed us a fifty-dollar Mehaiwe Bank bill; I referred to my mem.; I can't tell what the number of the bill is now; went to the state's attorney's office, and had Cummings arrested.

By Defence—Were there any inducements held out to the prisoner to make any statement?

Answer—No. He said he supposed Hubbard had got the note passed at Hornellsville, telegraphed and had him arrested. The United States attorney took my memorandum. Fletcher went back for it, but could not get it; he got a copy of it; prisoner told me it I had told him of the arrest, he would have given me satisfaction about it.

Nothing of importance was elicited on the cross examination.

Fletcher, sworn.—Was one of the emigrating party. In Detroit went into the broker's office, where Cummings got his money changed, with Tryon; asked him whether he had a certain bill; he hesitated, said he had a $50 bill on Mehaiwe Bank, marked No. 306. This is the same office, where Cummings had just been; none of us got any large notes changed. Tryon had a memorandum of the bill; have here a copy of it.

This was offered in evidence, but objected to, and objection sustained.

Nicholas Payne, sworn.—Am teller in Dye's Bank, Detroit, [the note was shown him,] that note I changed last October, early in the morning; changed it for the prisoner; put my initials on the note; in the afternoon, Tryon came to me and searched for the note.

In the cross-examination, the defence endeavored to show that the witness could not identify the prisoner with certainty, and that the bill received from him was mixed up with the other bills in such a manner that its identity also became uncertain.

A. W. Sprague, sworn—Am a police officer of Detroit; the deputy marshall handed the prisoner into my charge, and I brought him here.

By the Defense—Both conversations I had with the prisoner when he was in my custody. I cautioned him against making any admission; didn't hold out any inducements to him to make any.

The defence objected to the testimony on the ground of a recent decision of the English courts, which excludes all testimony by policemen as to admissions made while the prisoners were in their custody. The point was reserved.

Examination continued—While on the way from the jail to the court house in Detroit, he said he never before believed in destiny, but he did now, and that he was destined to take that money; thought the man insane, and so did others. He showed me the portrait of his child, and said that child was the occasion of his taking the money.

The prosecution closed here.

J. C. Dunn was sworn, and testified to the manner in which the mails are made up. At the conclusion of his testimony, the court adjourned.

IRWIN, District Judge, charged the jury, after which they retired, with instructions to bring in a sealed verdict.

The jury came to a verdict on Wednesday evening, about ten o'clock. The verdict was sealed. On Thursday morning, at the opening of court, the jury were called to their boxes, and the verdict being opened read "Guilty" with a recommendation to the mercy of the court.

Col. Black, for the defence, made a motion in arrest of judgment, which was argued on Friday morning. The motion was made upon an alleged deficiency in the indictment.

[NOTE. At a subsequent hearing of the case, upon a motion for an arrest of judgment, May 26, 1855, the defendant was remanded to prison, no amount of bail being made. Case No. 14,901a. A bill was filed against the prisoner in the month of October following, upon a charge of larceny of a $50 note. The jury rendered a verdict of "Guilty in manner and form as he stands indicted," and the prisoner was remanded. Id. 14,901b. At a final hearing of the case, in April, 1856, the prisoner was released, having entered into a bond for $2,000. Id. 14,901.]